UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TANYA FAISON and SONIA LEWIS,<br><br>Plaintiffs,<br><br>v.<br><br>SCOTT R. JONES, individually and as Sheriff of Sacramento County,<br><br>Defendant. | No. 2:19-cv-00182-TLN-KJN<br><br>**ORDER** |

This matter is before the Court on Plaintiffs Tanya Faison and Sonia Lewis's (collectively, "Plaintiffs") Motion for Preliminary Injunction. (ECF No. 9.) Defendant Scott R. Jones ("Defendant") filed an opposition. (ECF No. 13.) Plaintiffs filed a reply. (ECF No. 18.) Having carefully considered the parties' briefing and for the reasons set forth below, the Court GRANTS Plaintiffs' motion.

///
///
///
///
///
///

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant is the Sheriff of Sacramento County, California. (ECF No. 9-1 at 7.) He was first elected in 2010 and was re-elected in 2014 and 2018. (ECF No. 13 at 6.) Defendant maintains a Facebook page titled "Sheriff Scott Jones" under the username @SheriffScottJones. (ECF No. 9-1 at 7.) Defendant asserts that his campaign consultants created the Facebook page in 2017 for campaign purposes and that the page currently has three administrators: Defendant and his two campaign consultants, Tab Berg and Kyle Macdonald. (ECF No. 13-2 at 4.)

The page features a profile photograph of Defendant in uniform and a banner photo of a Sacramento County Sheriff's Department vehicle across the top of the page. (ECF No. 9-4 at 6.) The page identifies Defendant as a "Public Figure." (*Id*.) The page includes an "About" link, which directs visitors to a biography that highlights Defendant's role, goals, and initiatives as "the 36th Sheriff of Sacramento County." (*Id.* at 8.) The page also features posts by Defendant, comments by Facebook users in response to Defendant's posts, and Defendant's replies to comments. (*See id.* at 10–81.) At the time Plaintiffs filed their motion, Defendant's Facebook page had nearly 10,000 "followers." (ECF No. 9-1 at 7.) The page also allows the general public who do not "follow" the page to view it, and any unbanned Facebook user is able to comment on Defendant's posts. (ECF No. 13-2 at 9.) If Defendant bans a Facebook user from the page, the banned user can view the page but cannot comment on posts.[1] (*Id.*; *see also* ECF No. 13 at 23.)

Defendant's posts are varied. Among them, Defendant posted about his 2018 campaign. (*Id.* at 7–8.) He posted about holidays, significant anniversaries, the passing of public figures, and personal updates about himself and his family. (*Id.*) He posted about his swearing in for his

---

[1] Defendant makes several evidentiary objections. (ECF No. 16.) The Court will address evidentiary objections only in regards to evidence upon which the Court relied in ruling on the instant motion for preliminary injunction. However, "the rules of evidence do not apply strictly to preliminary injunction proceedings." *Herb Reed Enter., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013). Defendant objects to Plaintiffs' assertion that "a Facebook user who is 'banned' can view the page but cannot interact with it in any way, including through commenting in the discussion." (ECF No. 16 at 3.) Plaintiffs respond that the assertion is supported by personal knowledge and also ask the Court to take judicial notice of this Facebook feature. (ECF No. 19 at 5–6.) Under Federal Rule of Evidence 201, a court can take judicial notice of a document when the subject "can be accurately and readily determined from the sources whose accuracy cannot reasonably be questioned." For the reasons stated in Plaintiffs' request, and noting no opposition by Defendant, the Court GRANTS Defendant's request, and takes judicial notice of this Facebook feature pursuant to Federal Rule of Evidence 201. The Court also notes that despite his objection to Plaintiffs' assertion about the effect of banning on Facebook, Defendant made essentially the same assertion in his opposition. (ECF No. 13 at 9, 23.) In any event, Defendant's objection is OVERRULED.

1   third term as Sheriff. (ECF No. 9-4 at 10.) He posted a link to the Sheriff's Department's official
2   press release after a shooting incident in Pittsburgh, Pennsylvania. (*Id.* at 12.)

3          Central to this dispute, Defendant repeatedly posted his opposition to calls for outside
4   oversight of the Sheriff's Department after Sacramento County deputies shot and killed Mikel
5   McIntyre, an African American man.[2] (*Id.* at 14.) In an October 31, 2018 post, Defendant urged
6   his supporters to attend an upcoming Sacramento County Board of Supervisors meeting regarding
7   oversight of the Sheriff's Department. (*Id.* ("I need those of you that support the Sheriff's
8   Department, that support the independence of Sheriffs as elected officials, or are against yet
9   another liberal takeover of law enforcement, to show up.")) Defendant reiterated this message in
10  similar posts on November 5, 2018 (*Id.* at 47), November 7, 2018 (*Id.* at 40), November 27, 2018
11  (*Id.* at 49), December 2, 2018 (*Id.* at 60), and December 4, 2018 (*Id.* at 75).

12         In his November 7, 2018 post, Defendant posted a link to an op-ed he authored for the
13  Sacramento Bee in which he defended the Department's independence and argued against outside
14  oversight. (*Id.* at 39–40.) In his November 27, 2018 post, Defendant announced that the District
15  Attorney's Office found all officers were fully justified in their use of force in the McIntyre
16  shooting and posted a picture of himself in uniform talking to several law enforcement officers.
17  (*Id.* at 49.) Defendant's posts generated dozens of comments and replies, including replies by
18  Defendant himself, wherein Facebook users debated the merits of the controversy. (*See*, *e.g.*, *id.*
19  at 18, 19, 20, 43, 52, 54, 64, 65, 66.)

20         Plaintiffs are "co-leads" of Black Lives Matter Sacramento ("BLM"). (ECF No. 9-1 at 9.)
21  BLM is a group that has expressed vocal criticism of law enforcement's treatment of African
22  Americans in and around Sacramento, including fatal shootings of African Americans. (*Id.* at 9–
23  10.) Plaintiffs have publicly criticized Defendant and the Sacramento County Sheriff's
24  Department and have advocated for mandatory oversight of the Department. (*Id.* at 10.)

---

[2]  Defendant objects to Plaintiffs' assertion that the Facebook page "has become a forum for debate over a controversy concerning the oversight of the Sheriff's Department, which began with the August 2018 publication of a Sacramento County's Inspector General report that criticized the Department over the 2017 fatal shooting of Mikel McIntyre by Sheriff's Deputies." (ECF No. 16 at 4.) To support this assertion, Plaintiffs' cite an Inspector General Report as found on the Sacramento County official website. (ECF No. 9-1 at 8.) Pursuant to Federal Rule of Evidence 201(c)(1), the Court uses its discretion to take judicial notice of the contents of the Inspector General's report about the Mikel McIntyre shooting. Defendant's objection is therefore OVERRULED.

Plaintiff Faison's claim relates to Defendant's November 5, 2018 post, in which Defendant criticized Phil Serna, a member of the Sacramento County Board of Supervisors, and posted a picture of Serna holding a BLM t-shirt. (ECF No. 9-4 at 47.) Defendant also included screenshots of posts from BLM and Fasion's Facebook pages that were critical of law enforcement. (*Id.*) Faison asserts that she commented on the post from her personal Facebook account as follows: "I think it's creepy that you have saved screen shots from my page from November 2015 . . . You[r] concern of my abilities looks to be real. Thank you for your confidence in me." (ECF No. 9-1 at 11.) According to Plaintiffs, Defendant deleted the comment, along with other critical comments Faison made on the page. (*Id.*) Defendant then banned Faison from his page altogether. (*Id.*) Later that night, Faison used a second profile she maintains to again comment on Defendant's page, including a comment stating, "Stop deleting my comments." (*Id.*) Defendant responded by deleting those comments and banning Fasion's second profile from his page. (*Id.*) As of the filing of the instant motion, Faison remains banned and is therefore unable to comment on the page. (*Id.*)

Plaintiff Lewis's claim relates to Defendant's October 31, 2018 post, which Defendant began, "Can you imagine the Sheriff's Department being controlled by . . . Black Lives Matter?" (ECF No. 9-4 at 14.) Later in the post, Defendant encouraged supporters to attend the upcoming Board of Supervisors meeting. (*Id.*) Lewis asserts that she posted a comment stating Defendant was resisting external oversight and accountability. (ECF No. 9-1 at 11.) Lewis claims Defendant deleted the comments and banned Lewis from the page. (*Id.* at 12.) As of the filing of the instant motion, Lewis remains banned and is therefore unable to comment on the page. (*Id.*)

Plaintiffs filed suit on January 30, 2019, seeking declaratory and injunctive relief and damages under 42 U.S.C. § 1983. (ECF No. 1.) Plaintiffs assert that by deleting their posts and banning them from his Facebook page, Defendant deprived Plaintiffs of their right to free speech under the First Amendment to the U.S. Constitution and Article 1, Section 2(a) of the California Constitution. (*Id.*) Plaintiffs filed the instant Motion for Preliminary Injunction on March 20, 2019. (ECF No. 9.)

///

4

## II. STANDARD OF LAW

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citing *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)). "The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasis added); *see also Costa Mesa City Employee's Assn. v. City of Costa Mesa*, 209 Cal. App. 4th 298, 305 (2012) ("The purpose of such an order is to preserve the status quo until a final determination following a trial.") (internal quotation marks omitted); *GoTo.com, Inc. v. Walt Disney, Co.*, 202 F.3d 1199, 1210 (9th Cir. 2000) ("The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy.") (internal quotation marks omitted). In cases where the movant seeks to alter the status quo, preliminary injunction is disfavored, and a higher level of scrutiny must apply. *Schrier v. University of Co.*, 427 F.3d 1253, 1259 (10th Cir. 2005). A preliminary injunction is not automatically denied simply because the movant seeks to alter the status quo, but instead the movant must meet heightened scrutiny. *Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir. 1995).

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter*, 555 U.S. at 20. A plaintiff must "make a showing on all four prongs" of the *Winter* test to obtain a preliminary injunction. *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011). In evaluating a plaintiff's motion for preliminary injunction, a district court may weigh the plaintiff's showings on the *Winter* elements using a sliding-scale approach. *Id.* A stronger showing on the balance of the hardships may support issuing a preliminary injunction even where the plaintiff shows that there are "serious questions on the merits . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Id.* Simply put, Plaintiffs must demonstrate, "that [if] serious questions going to

5

the merits were raised [then] the balance of hardships [must] tip[ ] sharply in the plaintiff's favor," in order to succeed in a request for preliminary injunction. *Id.* at 1134–35 (emphasis added).

### III. ANALYSIS

#### A. Mandatory or Prohibitory Injunction

As an initial matter, the parties disagree about whether Plaintiffs seek a mandatory or prohibitory injunction. (*See* ECF No. 13 at 11–12; ECF No. 18 at 11.)

The Ninth Circuit has distinguished between mandatory and prohibitory injunctions. *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 878–79 (9th Cir. 2009). "A prohibitory injunction prohibits a party from taking action and preserve[s] the status quo pending a determination of the action on the merits." *Id.* at 878 (citation omitted). "The status quo ante litem refers not simply to any situation before the filing of a lawsuit, but instead to the last uncontested status which preceded the pending controversy." *GoTo.com, Inc.*, 202 F.3d at 1210 (internal quotation marks omitted). In contrast, "[a] mandatory injunction orders a responsible party to take action." *Marlyn*, 571 F.3d at 879 (citation and internal quotation marks omitted). "A mandatory injunction goes well beyond simply maintaining the status quo . . . [and] is particularly disfavored." *Id.* (citation and internal quotation marks omitted).

Defendant argues that Plaintiffs seek to alter the status quo and thus seek a mandatory injunction, which triggers a heightened burden of proof. (ECF No. 13 at 11–12.) Plaintiffs respond that they seek a prohibitory injunction, which is not subject to a heightened burden of proof, because their aim is to preserve rather than alter the status quo. (ECF No. 18 at 11.)

The Court agrees with Plaintiffs. Although granting the injunction would require Defendant to act — namely, to unban Plaintiffs — such action does not go "well beyond simply maintaining the status quo." *See Marlyn*, 571 F.3d at 879. Here, the "last uncontested status" of the parties was when Plaintiffs were unbanned and free to comment on Defendant's Facebook page, and Plaintiffs seek to preserve the status quo that existed before Defendant began its allegedly unlawful conduct. *See GoTo.com, Inc.*, 202 F.3d at 1210 ("In this case, the status quo ante litem existed before Disney began using its allegedly infringing logo."); *see also Marlyn*,

1    571 F.3d at 879 (concluding that the part of an injunction preventing further unlawful conduct
2    was not mandatory). The Court therefore finds that Plaintiffs' requested relief is for a prohibitory
3    injunction.

B.     Likelihood of Success on the Merits

"To state a claim for relief in an action brought under § 1983, [Plaintiffs] must establish that they were deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999).

Here, Plaintiffs argue that they are likely to succeed on the merits of their § 1983 claims because (1) they have Article III standing to bring their claims, (2) Defendant acted under the color of state law, (3) Defendant's Facebook page constitutes a public forum, and (4) Defendant violated the First Amendment by banning Plaintiffs from the page. (ECF No. 9-1.) The Court will address the elements of Plaintiffs' claims in turn.

*i.     Standing*

In order to establish Article III standing, "the plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). Plaintiffs argue they have standing because (1) they are unable to contribute to the exchange of viewpoints that occurs on Defendant's Facebook page, (2) their inability to comment on the page is directly traceable to Defendant's decision to ban them from the page, and (3) a favorable decision by this Court will provide redress. (ECF No. 9-1 at 14.) Defendant does not dispute that Plaintiffs have standing. Based on the foregoing, the Court finds that Plaintiffs have sufficiently established they have standing to bring the present motion.

*ii.    State Actor*

Plaintiffs argue Defendant acted under the color of state law because he used his Facebook page as an instrumentality of his public office. (ECF No. 9-1 at 18.) More specifically, Plaintiffs emphasize that Defendant used his page to convey messages about his official functions and to encourage supporters to attend public meetings related to the Sheriff's Department. (*Id.*)

7

1  Plaintiffs also emphasize that Defendant banned Plaintiffs based on comments that related to
2  Defendant's status as Sheriff.  (*Id.*)

3        In opposition, Defendant argues that his Facebook page is a non-official personal
4  Facebook page.  (ECF No. 13 at 16.)  Defendant contends he created the subject Facebook page
5  for his campaign and the page is not tied to Sacramento County.  (*Id.* at 17.)  Defendant also
6  points out that he categorized himself as a "Public Figure" on the page rather than a "Government
7  Official."  (*Id.* at 15.)  For these reasons, Defendant argues his actions related to the page are that
8  of a private citizen, not a state actor.  (*Id.* at 16–17.)

9        To determine whether conduct amounts to state action, courts consider the totality of
10 circumstances.  *Skinner v. Ry. Labor Executives' Assoc.*, 489 U.S. 602, 614–15 (1989); *Howerton*
11 *v. Gabica*, 708 F.2d 380, 384 (9th Cir. 1983).  Ultimately, there must be a "sufficiently close
12 nexus between the State and the challenged action of the regulated entity so that the action of the
13 latter may be fairly treated as that of the State itself."  *Jackson v. Metro. Edison Co.*, 419 U.S.
14 345, 351 (1974).  The Ninth Circuit has not addressed state action in the context of a government
15 official blocking someone from social media.  However, the Second and Fourth Circuits, as well
16 as the Southern District of California, have recently addressed the issue.  To the extent those
17 cases provide persuasive authority to the Court, they are addressed here.

18       In *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 928 F.3d 226 (2d Cir.
19 2019), plaintiffs brought a § 1983 claim after President Trump blocked them from his public
20 Twitter account because they criticized him and/or his policies.  The court concluded that
21 President Trump acted in a governmental capacity, not as a private citizen, in blocking users.  *Id.*
22 at 234–236.  The court noted that the Twitter account bore "all the trapping of an official state-run
23 account" because the President used his official title on the account and posted photographs of
24 himself engaged in official duties, such as signing executive orders and delivering remarks.  *Id.* at
25 231.  Further, the court found persuasive that the President and the White House presented the
26 account as the President's official account.  *Id.* at 235.  The court also emphasized that the
27 President used the account on "almost a daily basis as a channel for communicating with the
28 public about his administration."  *Id.*  For example, President Trump used the account to

announce matters of official government business, such as high-level staff changes, changes to major national policies, and engagement with foreign leaders on foreign policy decisions. *Id.* at 235–36. The court concluded that "the factors pointing to the public, non-private nature of the Account and its interactive features are overwhelming." *Id.* at 236.

In *Davison v. Randall*, 912 F.3d 666, 681 (4th Cir. 2019), the Fourth Circuit affirmed a finding that the Chair of a County Board of Supervisors ("the Chair") acted under color of state law in blocking plaintiff from her Facebook page. The court noted that the Chair used her page to inform the public about the Board's official activities and numerous aspects of the Chair's official duties, such as notifying the public about upcoming meetings, inviting the public to participate, publicizing trips she had taken in furtherance of county business, and informing the public about significant public safety events. *Id.* at 680–81. The court also found persuasive that the Chair used her official title on the page, included her county email address, linked to the county website and contact information, and categorized the page as one for a "Government Official." *Id.* Finally, the court emphasized that the Chair's "specific actions giving rise to plaintiff's claim are linked to events which arose out of her official status" because the Chair blocked plaintiff after he commented on a post by the Chair about at a town hall meeting. *Id.* Therefore, despite there being a "few" posts addressing topics less closely related to her official duties, the court affirmed the finding that the Chair's blocking of plaintiff was state action. *Id.* at 674, 681.

The Southern District of California also recently addressed the issue in *Garnier v. Poway Unified Sch. Dist.*, No. 17-CV-2215-W (JLB), 2019 WL 4736208, at *7 (S.D. Cal. Sept. 26, 2019). The defendants in *Garnier* were members of a school board who created public Facebook pages to help promote their campaigns. *Id.* at *1. Plaintiffs brought a § 1983 claim after the defendants blocked them from their Facebook page. *Id.* at *2. In determining whether the defendants acted under color of state law, the court noted that defendants changed their pages to reflect their board positions after winning the elections, categorized their pages as those of a "Government Official," identified themselves by their official titles, and included the official school board email address. *Id.* at *7. The court also mentioned that defendants used their pages to provide information about their school board activities and other school board information,

such as linking to an online synopsis of a school board meeting and providing notice about board meetings and subjects to be discussed. *Id.* Finally, the court stated that just as in *Davison*, defendants' posts were linked to events which arose out of their official status as school board members. *Id.* Based on the foregoing, the court found that defendants acted under color of state law because "[t]he content of [the defendants'] posts, considered in totality, went beyond their policy preferences or information about their campaigns for reelection . . . and bore a sufficiently close nexus with the state." *Id.*

Here, like the defendants in *Garnier*, Defendant argues he created his Facebook page as a tool for his campaign. (ECF No. 13 at 19–20.) Defendant also repeatedly emphasizes that he labeled himself a "Public Figure" on the page rather than a "Government Official." (*Id.* at 8.) However, Defendant cannot escape his role as a government official simply by calling himself a public figure. As noted, when determining whether an individual's conduct amounts to state action, courts consider the totality of circumstances. *Skinner*, 489 U.S. at 614–15. Like President Trump in *Knight*, Defendant's Facebook page bore "all the trappings" of his state office. 928 F.3d 231. For example, Defendant's profile photograph shows him in a law enforcement uniform, his banner photograph across the top of the page is a Sacramento County Sheriff's vehicle, and Defendant uses his official title on the page. (ECF No. 9-4 at 5–10.)

Defendant also used the page much like the defendants in *Davison* and *Garnier*. A Sheriff's central function is to represent the interests of the Sheriff's Department. To that end, Defendant posted against outside oversight of the Sheriff's Department at least six times in a little over a month and encouraged his supporters to get involved. (ECF No. 9-4 at 14, 40, 47, 49, 60, 75.) Defendant also engaged in back and forth discussions about the controversy on his page, sometimes explicitly speaking on behalf of the Sheriff's Department. (*See*, *e.g.*, *id.* at 65 ("We are as accountable as every law enforcement agency is.")) Moreover, Defendant informed the public about developments in the McIntrye shooting in at least one post and linked to a Sheriff's Department press release about a separate shooting in another post. (ECF No. 9-4 at 12, 49.) Finally, like the courts in *Davison* and *Garnier*, the Court is especially persuaded by the fact that Plaintiffs' claims arise from critical comments they made regarding Defendant's role as Sheriff.

Defendant argues the instant case is more analogous to *German v. Eudaly*, No. 3:17-CV-2028-MO, 2018 WL 3212020 (D. Or. June 29, 2018). In *German*, the plaintiff brought a § 1983 claim against a City Commissioner for blocking her from the Commissioner's private Facebook page. *Id.* at *3. The court found that the plaintiff failed to allege state action when the only facts supporting that allegation were (1) the defendant was a city commissioner, (2) the defendant "discussed [plaintiff's] City Business" on the Facebook page, and (3) the Facebook page in question was a "non-official Facebook page" separate from the Commissioner's "official Facebook page to discuss City Business." *Id.* at *6. Defendant's argument is unavailing. Admittedly, the evidence of state action in this case is not as "overwhelming" as the evidence in *Knight*, but it certainly amounts to more than the few, bare allegations provided in *German*. For the foregoing reasons, Plaintiffs are likely to succeed in showing Defendant acted under color of state law because his administration of the Facebook page bore "a sufficiently close nexus with the state." *See Jackson*, 419 U.S. at 351.

### iii.   Public Forum

Plaintiffs assert that Defendant's Facebook page is a public forum. (ECF No. 9-1 at 17.) In opposition, Defendant argues that the page is not a public forum because the government does not own or control his Facebook page. (ECF No. 13 at 12.)

In deciding whether a space is a public forum, courts look at "the policy and practice of the government," as well as "the nature of the property and its compatibility with expressive activity" to determine the government's intent. *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 802 (1985). "We will not find that a public forum has been created in the face of clear evidence of a contrary intent . . . nor will we infer that the government intended to create a public forum when the nature of the property is inconsistent with expressive activity." *Id.* at 803. "Opening an instrumentality of communication 'for indiscriminate use by the general public' creates a public forum." *Id.* (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 47 (1983)). Further, a public forum need not be "spatial or geographic," rather "the same principles are applicable" to a "metaphysical forum." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 830 (1995).

The *Davison* court concluded that the Chair's Facebook page was a public forum because the Chair "intentionally opened the public comment section . . . for public discourse" and expressly invited "any . . . citizen to make posts to the . . . interactive component of the page on any issue." 912 F.3d at 682 (internal citation and quotation marks omitted). Moreover, the Chair placed no restrictions on the public's access to the page or use of the interactive component and the public did in fact make numerous posts on matters of public concern. *Id.* In *Knight*, the Second Circuit held President Trump's Twitter account was a public forum because the account "was intentionally opened for public discussion when the President, upon assuming office, repeatedly used the account as an official vehicle for governance and made its interactive features accessible to the public without limitation." 928 F.3d at 237. Similarly, in *Garnier*, the Southern District of California found that the interactive portion of the defendants' Facebook pages were public forums because the defendants "were posting content related to their positions as public officials and had opened the pages to the public without limitation when they blocked Garnier." *Garnier*, 2019 WL 4736208, at *25.

Here, as already discussed, Plaintiffs are likely to succeed in showing Defendant was a state actor in regard to administration of his Facebook page. To that extent, the page was government-controlled. Looking to the functionality of the page, Defendant argues that the administrators of the page have exercised editorial control over what appears on the page by using a profanity filter, limiting who can make direct posts, hiding and deleting some comments, and banning numerous profiles from the page. (ECF No. 13 at 17.) But the fact that Defendant banned other users from the page does not diminish its status as a public forum. To the contrary, such censorship only worsens the Court's concerns. It is undisputed that any unbanned Facebook user is able to comment on Defendant's posts without limitation. (*See* ECF No. 13-2 at 7.) In other words, members of the public are free to comment on Defendant's posts *until* Defendant chooses to ban them. Further, members of the public did post about matters of public concern — oftentimes in response to Defendant's own posts about Sheriff's Department issues — and Defendant repeatedly replied to those discussions. (*See* ECF No. 9-4 at 18, 65.)

Therefore, Plaintiffs are likely to succeed in showing that that the interactive component

of the page, which Defendant left open for public discourse, was a public forum.

### iv.     Viewpoint Discrimination

Viewpoint discrimination is prohibited in all forums.[3]  *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 679 (1992); *see also Knight*, 928 F.3d at 236, 238 ("Once it is established that the President is a government actor with respect to his [Twitter a]ccount, viewpoint discrimination violates the First Amendment . . . once he opens up the interactive features of his account to the public at large he is not entitled to censor selected users because they express views with which he disagrees.").  "Viewpoint discrimination is apparent . . . if a government official's decision to take a challenged action was 'impermissibly motivated by a desire to suppress a particular point of view.'"  *Davison*, 912 F.3d at 687 (quoting *Cornelius*, 473 U.S. at 812–13) ("That [the defendants'] action targeted comments critical of the School Board members' official actions and fitness for office renders the banning all the more problematic as such speech 'occupies the core of the protection afforded by the First Amendment.'")

Defendant argues that Plaintiffs fail to provide sufficient evidence that Defendant discriminated against Plaintiffs based on their viewpoints.  (ECF No. 13 at 20.)  Yet it is abundantly clear that Defendant strongly disagrees with BLM's viewpoints on the topic of Department oversight.  It is undisputed that Defendant banned Lewis after she commented on a post related to Defendant's resistance to oversight, in which Defendant expressly criticized BLM.  It is also undisputed that Defendant banned Fasion after she commented on another post in which Defendant expressly criticized BLM and Fasion.  Both Plaintiffs filed signed declarations, attesting to the fact that Defendant deleted their comments that were critical of him or the Sheriff's Department.  (ECF No. 9-2 at 7; ECF No. 9-3 at 2.)  For his part, Defendant offers no alternate justification or explanation as to why he banned the two co-leads of BLM who have been publicly critical of Defendant and the Sheriff's Department, after they commented on his

---

[3] Plaintiffs argue they are likely to succeed on the merits based on three separate theories: content-based discrimination, viewpoint-based discrimination, and speaker-based discrimination.  (ECF No. 9-1 at 14.)  Because the Court finds Plaintiffs are likely to succeed on the merits of their viewpoint discrimination theory, the Court need not and does not address Plaintiffs' remaining theories.

13

posts about the Department oversight controversy. For these reasons, Plaintiffs are likely to succeed in showing that Defendant engaged in viewpoint discrimination.

### v.     Government Speech

Defendant argues in the alternative that his administration of the Facebook page is exempt from First Amendment scrutiny because it constitutes government speech. (ECF No. 13 at 18.)

The Supreme Court discussed the government speech doctrine in *Matal v. Tam*, 137 S. Ct. 1744, 1757–58 (2017). The Court emphasized that "the First Amendment does not say that Congress and other government entities must abridge their own ability to speak freely. And our cases recognize that '[t]he Free Speech Clause ... does not regulate government speech.'" *Id.* at 1757 (citations omitted). The Court stated, "When a government entity embarks on a course of action, it necessarily takes a particular viewpoint and rejects others. The Free Speech Clause does not require government to maintain viewpoint neutrality when its officers and employees speak about that venture." *Id.* at 1757. Further, the Court cautioned that "while the government-speech doctrine is important — indeed, essential — it is a doctrine that is susceptible to dangerous misuse. If private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints." *Id.* The Court warned that "we must exercise great caution before extending our government-speech precedents." *Id.*

The *Davison* and *Knight* courts each rejected arguments similar to Defendant's. In *Knight*, the court stated, "[W]hile the President's tweets can accurately be described as government speech, the retweets, replies, and likes of other users in response to his tweets are not government speech under any formulation." 928 F.3d at 239. Similarly, in *Davison*, the court concluded that the Chair's "comments . . . amount to government speech . . .[b]ut the interactive component of the Chair's Facebook page . . . is materially different." 912 F.3d at 687.

The Supreme Court's discussion in *Matal* — reinforced by *Davison* and *Knight* — makes clear that while Defendant's own posts likely qualify as government speech, Plaintiffs' comments do not. Defendant relies primarily on one case: *Morgan v. Bevin*, 298 F. Supp. 3d 1003 (E.D. Ky. 2018). But *Bevins* is unpersuasive because the court there merged the government and private

speech analysis and found that a Governor's Facebook page and Twitter account were privately-owned based on reasoning that is at odds with the more recent Second and Fourth Circuit decisions. *Id.* at 1011–1013.  Moreover, Defendant fails to develop his argument beyond citing a lengthy passage from *Bevins*.  (ECF No. 13 at 18.)  For these reasons, the Court finds that Defendant's argument does not diminish Plaintiffs' likelihood of success in showing that Defendant engaged in viewpoint discrimination.

In sum, Plaintiffs are likely to succeed on the merits of their § 1983 claims because they have demonstrated (1) they have Article III standing, (2) Defendant acted under color of state law, (3) the interactive portion of Defendant's Facebook page is a public forum, and (4) Defendant engaged in viewpoint discrimination in violation of the First Amendment.  The Court also notes that, as will be discussed below, the balance of the equities in this case tip sharply in Plaintiffs' favor.  Therefore, a preliminary injunction is proper even if Plaintiffs' showing only raises "serious questions going to the merits." *Alliance*, 632 F.3d at 1135.

### C. Irreparable Harm

Plaintiffs argue they will suffer irreparable harm in the absence of an injunction because their banning results in the loss of First Amendment rights in the context of critical, time-sensitive political speech.  (ECF No. 9-1 at 23–24.)  Defendant responds that there is no irreparable harm because Plaintiffs, as public figures themselves, can use other channels to get their message out, such as holding press conferences, speaking at Board of Supervisors meetings, or posting on their own Facebook pages.  (ECF No. 13 at 22–23.)

"Both this court and the Supreme Court have repeatedly held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Klein v. City of San Clemente*, 584 F.3d 1196, 1207–08 (9th Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).  "The harm is particularly irreparable where . . . a plaintiff seeks to engage in political speech, as 'timing is of the essence in politics' and '[a] delay of even a day or two may be intolerable.'" *Id.* (quoting *Long Beach Area Peace Network v. City of Long Beach*, 522 F.3d 1010, 1020 (9th Cir. 2008)).

The thrust of Defendant's argument is that Plaintiffs can still get their message out despite

the ban. The *Knight* court rejected a similar argument, stating that "the fact that the [plaintiffs] retain some ability to 'work around' the blocking does not cure the constitutional violation. Neither does the fact that the [plaintiffs] can post messages elsewhere." 928 F.3d at 238. The Court agrees with the reasoning in *Knight*. Regardless of Plaintiffs' ability to get their message out elsewhere, Plaintiffs' inability to post on Defendant's Facebook page is a burden on their speech. Burdens to speech run afoul of the First Amendment. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011); *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 690 (2010) ("When the government has discriminated against a speaker based on the speaker's viewpoint, the ability to engage in other speech does not cure that constitutional shortcoming.") Plaintiffs' harm is multiplied by the fact that the ban prevents Plaintiffs from engaging in political speech in an ongoing controversy. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346–47 (1995) (emphasizing that discussion of public issues and criticism of public officials "occupies the core of the protection afforded by the First Amendment"). Indeed, Plaintiffs provide specific examples of matters of public concern they would have commented on but for the ban. (ECF No. 9-1 at 24.) The Court therefore finds that Plaintiffs have shown a likelihood of irreparable harm in the absence of an injunction.

    D.  Public Interest

  Plaintiffs contend that it is in the public interest to protect First Amendment rights. (ECF No. 9-1 at 24.) In opposition, Defendant argues that a preliminary injunction could have a broad chilling effect on the exercise of free speech rights by other public officials. (ECF No. 13 at 24.)

  To be sure, there is a public interest in encouraging public officials to communicate and make themselves accessible to their constituents over social media. But the public interest in free political speech is far greater. *McIntyre*, 514 U.S. at 346–47; *see also Klein*, 584 F.3d at 1208 ("We have also consistently recognized the significant public interest in upholding free speech principles as the ongoing enforcement of the potentially unconstitutional regulations . . . would infringe not only the free expression interests of [plaintiffs], but also the interests of other people subjected to the same restrictions.") Moreover, no public good would be served if public officials were accessible over social media but only to some as Defendant's position would have the Court

allow. Further, there is no indication the requested injunction would infringe on Defendant's free speech.[4]  For these reasons, the Court finds the public interest weighs heavily in Plaintiffs' favor.

### E. Balance of Equities

Plaintiffs argue that the balance of hardships tips sharply in Plaintiffs' favor because granting the injunction will ensure they can exercise their First Amendment rights, and there is no evidence of hardship Defendant will suffer if he restores Plaintiffs' rights. (ECF No. 9-1 at 24–25.) Defendant argues that construing the Facebook page as a public forum would be inconsistent with its intended purpose, significantly curtail the page's effectiveness as a political campaign tool, and likely cause it to be shut down altogether. (ECF No. 13 at 23–24.) Defendant also argues that it would give his political opponents an unfair campaign advantage because they would not be restricted in their ability to use Facebook for fundraising and political messaging. (*Id.*) Finally, Defendant contends that the harm to Plaintiffs, if any, is minimal. (*Id.*)

Here, the harm to Plaintiffs is a burden on their right to participate in the public discourse that occurs on Defendant's Facebook page, which includes debate on official matters and controversies concerning Defendant and the Sheriff's Department. Defendant's harm pales in comparison. It is unclear how allowing free speech on Defendant's Facebook page will significantly harm a future campaign, especially when — as he points out — he does allow other critical comments to remain on the page. (ECF No. 13 at 21.) With respect to Defendant's assertion that he will shut down the page if the Court grants the injunction, such harm would be self-inflicted. (ECF No. 13-1 at 3.) In any event, the harm of shutting down a Facebook page is far less than the harm of losing fiercely-protected First Amendment rights. Thus, the Court finds that the balance of equities tips sharply in Plaintiffs' favor.

### IV. CONCLUSION

---

[4] Defendant argues that requiring him to leave comments on his page written by someone else amounts to compelled speech in violation of his First Amendment rights. (ECF No. 13 at 17.) The Court disagrees. It is undisputed that administrators of the page are the only parties who can post directly on the page. (*Id.* at 9.) Other Facebook users are limited to commenting on Defendant's posts. (*Id.*) Upon reviewing screenshots of the posts on Defendant's Facebook page, it appears that the author of each post and comment is clearly indicated. (*See* ECF No. 9-4 10–81.) As such, there is little or no risk that Plaintiffs' comments will be "identified with those of" Defendant, and Defendant "can expressly disavow any connection" with Plaintiffs' comments by posting his own response. *PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980).

For the foregoing reasons, the Court hereby GRANTS Plaintiffs' Motion for Preliminary Injunction. (ECF No. 9.) The Court ORDERS Defendant to unban Plaintiffs from his Facebook page, retain them in unbanned status, and take no further action restricting their participation unless and until further order of this Court.

IT IS SO ORDERED.

Dated: February 19, 2020

Troy L. Nunley
United States District Judge